**GIRARD SHARP LLP**
Dena C. Sharp (SBN 245869)
Scott Grzenczyk (SBN 279309)
Sean Greene (SBN 328718)
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
dsharp@girardsharp.com
scottg@girardsharp.com
sgreene@girardsharp.com

*Attorneys for Plaintiff and the Proposed Class*

*Additional Counsel Listed on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| GUS' PHARMACY, LLC d/b/a KENNEDY PHARMACY, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| *Plaintiff,* | **DEMAND FOR JURY TRIAL** |
| v. | |
| GOODRX, INC.; GOODRX HOLDINGS, INC.; CAREMARK, L.L.C.; EXPRESS SCRIPTS, INC.; MEDIMPACT HEALTHCARE, SYSTEMS, INC.; and NAVITUS HEALTH SOLUTIONS, LLC, | |
| *Defendants.* | |

Gus' Pharmacy, LLC d/b/a Kennedy Pharmacy ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint for injunctive relief, damages, and other relief as appropriate, based on Defendants' violations of federal antitrust laws.

# I.    INTRODUCTION

1.    This action arises from a scheme by Defendants to artificially suppress the reimbursement rates paid to pharmacies unaffiliated with Defendants ("Independent Pharmacies"), like Plaintiff and the other members of the Class, for generic prescription drug claims. Defendants are GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "GoodRx"), a company specializing in prescription discount cards, and four major U.S. pharmacy benefit managers ("PBMs"): Caremark, L.L.C. ("Caremark"), Express Scripts, Inc. ("Express Scripts"), MedImpact Healthcare Systems, Inc. ("MedImpact"), and Navitus Health Solutions, LLC ("Navitus"). The PBMs are collectively referred to as the "PBM Defendants," and GoodRx and the PBM Defendants are collectively referred to as "Defendants."

2.    PBM Defendants operate in and dominate a highly-concentrated market.[1] Caremark and Express Scripts alone process more than half of all prescription claims in the U.S. Combined with OptumRx, these entities form the "Big 3" PBMs, which collectively control over 80% of the Relevant Market. Including Humana, Prime Therapeutics, and MedImpact, these PBMs process over 95% of all prescriptions nationwide.

3.    Over the years, PBM Defendants have vertically integrated themselves into various sectors of the healthcare and pharmaceutical supply chain, including pharmacies,

---

[1] The relevant market alleged herein is for pharmacy reimbursements for prescription drug dispensing services provided by network pharmacies in the United States (Relevant Market"). *See infra*, Section VI.

1

insurers, and drug distributors. This integration has resulted in powerful conglomerates that wield significant influence over access to and pricing of prescription drugs in the U.S. Each PBM Defendant is part of a larger healthcare organization that also owns mail-order, specialty, and/or retail pharmacies, in addition to other key players in the prescription drug market.

4.     Each PBM Defendant has created its own prescription discount card program, which offers in-network pricing to consumers purchasing medications outside of insurance plans. Historically, these discount cards served as a resource for uninsured individuals or for those whose insurance did not cover specific medications.

5.     PBMs charge a fee to the pharmacy on every discount card transaction, and do not reimburse the pharmacy, leaving the discounted price paid by the patient (minus the PBM fee) as the only revenue to the pharmacy. As a result, pharmacies often lose money on discount card transactions but initially agreed to honor them to foster customer loyalty and bring traffic into their stores.

6.     In the past, pharmacies could decide whether to accept discount cards. However, as PBMs have gained market dominance, accepting their discount cards has become a requirement for pharmacies to remain in-network and serve PBM-insured customers.

7.     GoodRx, launched in 2011, functions as a discount card aggregator, and utilizes software to compare prices across PBM discount card programs. Consumers can use GoodRx's platform to find lower prices than their out-of-pocket insurance costs.

8.     When a patient opts to purchase a drug through GoodRx, GoodRx receives a share of the transaction fee paid by the pharmacy.

9.     PBM Defendants use their dominant position to implement anti-competitive practices that stifle competition to the detriment of Independent Pharmacies. These strategies have driven many Independent Pharmacies out of business, boosting the market share of PBM-affiliated pharmacies.

CLASS ACTION COMPLAINT
CASE NO.

10.     All PBMs see Independent Pharmacies as competitors that pose a threat to their market dominance. The PBM Defendants did something about it. They formed and implemented a price-fixing arrangement with GoodRx (the "ISP Scheme") to (i) share and access real-time pricing data with other PBMs using GoodRx's platform and (ii) allocate transactions to the PBM offering the lowest consumer discount price (and lowest pharmacy reimbursement rate), circumventing negotiated reimbursement rates that PBM Defendants negotiated with pharmacies on behalf of insurers. This strategy aims to increase the use of prescription discount cards, making the process automatic for insured patients.

11.     In 2023, GoodRx formed partnerships with the PBM Defendants that altered the role of discount cards in the prescription drug market. GoodRx has entered into agreements with the PBM Defendants that automate the process of rerouting transactions to the PBM offering the lowest discount price for insured patients, often without the patient's knowledge or consent. The pharmacy pays a fee for these discount card transactions, which is shared among GoodRx, the patient's PBM, and the PBM processing the transaction.

12.     Just like other GoodRx transactions, and unlike standard insurance transactions, no third-party reimbursement is provided, meaning all revenue is derived from the patient's payment made directly to the pharmacy.

13.     Through these partnerships, PBMs collect fees directly from patients' payments for discount card transactions, bypassing traditional reimbursement models. This arrangement makes discount card transactions more lucrative for PBMs than regular insurance claims, especially for generic drugs.

14.     By increasing the proportion of transactions processed via discount cards, PBMs claim a larger share of payments at the expense of pharmacies, threatening the viability of Independent Pharmacies that lack affiliated PBM operations to offset revenue losses.

3

CLASS ACTION COMPLAINT
CASE NO.

15. The GoodRx-PBM collaborations constitute illegal price-fixing agreements, allowing the Defendant PBMs to use GoodRx's platform to identify and select the lowest pharmacy reimbursements across competing PBMs rather than adhering to their negotiated reimbursement rates with pharmacies. This practice reduces reimbursements for Independent Pharmacies while maximizing PBM profits, driving more transactions through discount cards and amplifying the financial strain on Independent Pharmacies.

16. Defendants' illegal conspiracy has directly harmed Independent Pharmacies, which suffer reduced reimbursements and higher fees associated with discount card transactions. The conspiracy hastened the closure of numerous Independent Pharmacies, diminishing competition in the prescription drug dispensing market. Ultimately, consumers bear the burden of higher drug prices, reduced pharmacy options, and lower-quality service.

17. The closure of Independent Pharmacies reduces competition and negatively impacts the quality of care that patients receive.

18. Plaintiff brings this action against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and seek monetary damages and injunctive relief to put a stop to Defendants' ongoing, concerted, anticompetitive conduct.

## II. JURISDICTION AND VENUE

19. Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and Section 1 of the Sherman Act (15 U.S.C. § 1).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), as this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

21. Venue is proper under Section 12 of the Clayton Act (15 U.S.C. § 22) because Defendants transact business in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District, including the provision of

CLASS ACTION COMPLAINT
CASE NO.

prescription drug dispensing services and the use of GoodRx's discount card programs in this District.

22.    This Court has personal jurisdiction over Defendants because, among other things, they either (1) transacted business throughout the United States, including this District, (2) have substantial contacts within the United States, including in this District, and/or (3) are engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and doing business in the United States, including in this District.

23.    No other forum would be more convenient for the parties and witnesses to litigate this case.

## III.    THE PARTIES

24.    Plaintiff Kennedy Pharmacy is a family-owned and operated pharmacy located at 42 E Laurel Rd. #1900, Stratford, NJ 08084. During the Class Period (defined below) and continuing to this day, Plaintiff received lower prescription claim reimbursements than it would have absent Defendants' conduct alleged herein.

25.    Defendant GoodRx, Inc. is a Delaware corporation with its principal office or place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. It is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which is a wholly owned subsidiary of GoodRx Holdings, Inc. GoodRx, Inc. transacts business in this District and throughout the United States.

26.    Defendant GoodRx Holdings, Inc. is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. GoodRx Holdings, Inc. transacts business in this District and throughout the United States.

27.    Defendant Caremark, L.L.C. ("Caremark") is a California corporation with its headquarters in Woonsocket, Rhode Island. Caremark is a pharmacy benefit manager and a wholly owned subsidiary of CVS Health Corporation ("CVS Health"). Other subsidiaries of CVS Health include, among others, CVS Pharmacy, CVS Specialty

CLASS ACTION COMPLAINT
CASE NO.

Pharmacy, and Aetna, Inc., the nation's third-largest health insurer. Caremark transacts business in this District and throughout the United States.

28.     Defendant Express Scripts Inc. ("Express Scripts") is a Delaware corporation with its headquarters in St. Louis, Missouri. Express Scripts is a pharmacy benefit manager and a wholly owned subsidiary of The Cigna Group. Other subsidiaries of the Cigna Group include Cigna Healthcare, the nation's seventh-largest health insurer, and Evernorth Health Services, which operates a mail-order pharmacy, a specialty pharmacy, and a specialty drug distributor. Express Scripts transacts business in this District and throughout the United States.

29.     Defendant MedImpact Healthcare Systems, Inc. ("MedImpact") is a California corporation with its headquarters in San Diego, California. MedImpact is a pharmacy benefit manager and wholly owned subsidiary of MedImpact Holdings, Inc. Other subsidiaries of MedImpact Holdings include, among others, Birdi, Inc. (a mail-order pharmacy) and Specialty by Birdi, a specialty pharmacy. MedImpact transacts business in this District and throughout the United States.

30.     Defendant Navitus Health Solutions, LLC ("Navitus") is a Wisconsin corporation with its headquarters in Madison, Wisconsin. Navitus is a pharmacy benefit manager and is owned jointly by SSM Health, a large healthcare system with locations in several states, and Costco Wholesale Corporation, the third largest retailer in the world. Costco has over 550 warehouse pharmacy locations in the United States. Navitus transacts business in this District and throughout the United States.

## IV.    FACTUAL BACKGROUND

### A.    Background on PBMs

31.     PBMs emerged in the late 1950s to address the growing need for managing prescription drug benefits provided by health insurers. By the late 1980s, PBMs had expanded their role significantly, introducing systems for processing prescription drug claims and reimbursing pharmacies.

CLASS ACTION COMPLAINT
CASE NO.

32.    Today, PBMs act as central intermediaries in the prescription drug supply chain, bridging the relationships between pharmacies, payers (including health insurers, employers, unions, and government entities), pharmaceutical manufacturers, and drug wholesalers.

33.    PBMs contract with health insurers, drug  manufacturers, and pharmacies to facilitate the distribution of medications, process claims, and manage reimbursement.

34.    They negotiate with drug manufacturers to include specific medications in their formularies, and contract with pharmacies to distribute these medications to insured patients, subject to the reimbursement terms and fees determined by the PBMs.

**B.    PBMS' Role in Prescription Drug Transactions**

35.    Prescription drug transactions in the U.S. involve five to eight entities, many of which operate behind the scenes and are unseen by the patient.

36.    Over time, the U.S. prescription drug market has grown more complex and more opaque.

37.    The process begins when a healthcare provider prescribes a medication to a patient and the provider sends, or patient takes, the prescription to the patient's chosen pharmacy. The pharmacy submits a claim for the amount to be paid by the patient's insurance plan. The claim is not sent directly to the insurer, however, but rather to a PBM engaged by the insurer to administer the patient's prescription benefits.

38.    The PBM then calculates a payment to the pharmacy using opaque and inconsistent reimbursement formulas that are influenced by factors such as agreements between insurers and PBMs, PBMs and pharmacies or Pharmacy Services Administrative Organizations ("PSAOs")—which negotiate on behalf of small and mid-sized Independent Pharmacies—pharmacies and drug suppliers or manufacturers, and insurers and their insureds. The PBM subsequently recoups reimbursement from the insurer based on a separate pricing structure negotiated between them.

39.    Figure 1, below, illustrates the network of financial relationships and the movement of prescription drugs and benefit claims among the entities participating in a typical prescription drug transaction.

**Figure 1: Illustration of Typical Prescription Drug Transaction**



C.    **Vertical Integration and Consolidation of the PBMs**

40.    Beginning in the 1970s, PBMs embarked on a significant and ongoing process of horizontal and vertical integration within the prescription drug dispensing industry. By 2023, the "Big Three" PBMs—Express Scripts, Caremark, and OptumRx—were responsible for processing nearly 80% of the approximately 6.6 billion prescriptions filled annually by pharmacies in the U.S.

41.    Furthermore, the PBM Defendants are all vertically integrated, meaning they either own or are owned by companies that operate upstream and downstream in the supply chain.

42.    As the FTC described in a recent report on PBMs:

All of the top six PBMs are vertically integrated downstream, operating their own mail order and specialty pharmacies, while one PBM [Caremark] owns and operates the largest chain of retail pharmacies in the nation.

Pharmacies affiliated with the three largest PBMs now account for nearly 70 percent of all specialty drug revenue. In addition, five of the top six PBMs are now part of corporate healthcare conglomerates that also own and operate some of the nation's largest health insurance companies, including three of the five largest health insurers in the country. Four of the PBMs are owned by publicly traded parent companies that own affiliates that operate health care clinics. Three have recently expanded into the drug private labeling business, partnering with drug manufacturers to distribute drug products under different trade names. Four healthcare conglomerates now account for an extraordinary 22 percent of all national health expenditures, as compared to 14 percent eight years ago.[2]

43.    Caremark provides a fitting example for such market concentration. Caremark's parent company, CVS Health Corporation, also owns CVS Pharmacy, CVS Caremark Mail Service Pharmacy, CVS Specialty Pharmacy, Aetna (the nation's third largest health insurance provider), Minute Clinic and Signify Health (health care providers), Cordavis Limited (a drug private labeler), and Zinc Health Services (a group purchasing organization).

44.    Figure 2, below, shows the corporate families of the six largest PBMs, demonstrating the high degree of vertical integration (and horizontal concentration) in the industry.

---

[2] Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, Interim Staff Report at 2-3 (2024) (internal citations omitted).

CLASS ACTION COMPLAINT
CASE NO.

**Figure 2: Vertical Integration of the Six Largest PBMs**



45.    Decades of significant market consolidation have endowed the largest PBMs—along with their associated insurance providers and pharmacy chains—with substantial market power over Independent Pharmacies, non-affiliated insurers, other industry players, and the patients whose healthcare they oversee.

46.    PBMs do not necessarily generate profits through standard insurance transactions. Historically, one major revenue stream was "spread pricing," where a PBM billed the insurance company a higher (and sometimes considerably higher) price for certain drugs than it paid the pharmacy. Due to the lack of transparency in PBM pricing practices, pharmacies were unable to identify when spread pricing occurred.

47.    As public awareness of these exploitative tactics grew, PBMs faced increased scrutiny and criticism. In response, they have shifted to new revenue-generating strategies that were only made possible by their vertical integration and dominant market position.

CLASS ACTION COMPLAINT
CASE NO.

48.    A significant and rapidly growing source of revenue for PBMs is the sale of "specialty drugs," a category encompassing high-cost medications used to treat complex, chronic conditions such as cancer, rheumatoid arthritis, and multiple sclerosis. Some of these medications require specialized handling or administration, such as injections or infusions.

49.    Over the past decade, revenue from specialty drugs has increased at a much faster rate than revenue from traditional pharmaceuticals. From 2016 to 2023, specialty drug revenues surged by more than 50%, rising from $113 billion in 2016 to $237 billion in 2023. Specialty drugs now account for an estimated 40 to 50 percent of total pharmaceutical dispensing revenue nationwide.

**Figure 3: Dispensing Revenue of U.S. Pharmacies**

(\$ in billions)



50.    The growth of specialty drugs in the market has led to the development of specialty pharmacies, which primarily dispense these high-cost medications, often through mail-order services.

51.    Each of the six largest PBMs operates its own specialty pharmacy, and specialty pharmacies affiliated with the Big Three PBMs collectively account for more than two-thirds of the revenue generated from the sale of specialty drugs.

11

CLASS ACTION COMPLAINT
CASE NO.

52.     Given the substantial profit potential, a significant portion of new drugs being developed and sold are classified as specialty drugs. PBMs capitalize on the high costs associated with these medications by compelling or encouraging their plan members to obtain specialty drugs exclusively from the PBMs' affiliated specialty pharmacies. This allows PBMs to charge inflated rates to their own specialty pharmacies while collecting full reimbursement for these costly drugs from health plans.

53.     The FTC recently concluded that "the Big 3 PBMs reimbursed their affiliated pharmacies at a higher rate than unaffiliated pharmacies" for specialty generic drugs.[3]

54.     The FTC also concluded that the Big 3 PBMs may be steering their most profitable prescriptions away from Independent Pharmacies and to their own affiliated pharmacies.[4]

### D.     Prescription Discount Cards

55.     In recent years, PBMs identified a new avenue to leverage their market dominance for additional revenue while simultaneously restricting competition: discount card programs.

56.     Historically, prescription discount cards offered an option for patients without insurance coverage or whose insurance did not cover a particular medication to obtain more affordable prescriptions.

57.     PBMs established discount programs by negotiating direct or cash network pricing (i.e., prices not subject to insurance reimbursement rates) with pharmacies and partnering with marketing firms to promote and distribute the discount cards to consumers.

---

[3] Fed. Trade Comm'n, *Specialty generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, Interim Staff Report at 2 (2025) (internal citations omitted).

[4] *Id.*

CLASS ACTION COMPLAINT
CASE NO.

58.    Pharmacies often agreed to accept certain discount cards so as to foster customer loyalty and attract foot traffic, as patients frequently purchase other items in addition to their prescriptions, even though the pharmacies typically incurred losses on the prescription transactions.

59.    Prescription discount cards differ from manufacturer coupons, although the consumer experience may appear similar. Drug manufacturers sometimes offer coupons for new brand-name medications to reduce patients' out-of-pocket expenses. Under these programs, the patient's insurance is billed as usual, the co-payment is reduced, and the manufacturer later reimburses the pharmacy for the remaining balance. These coupons are typically limited to brand-name medications, offered for a finite period, and subject to usage restrictions.

60.    In contrast, pharmacies do not receive reimbursement from a third-party payer for transactions involving discount cards and instead remit a portion of the payment received from the patient to the PBM in the form of a fee.

61.    Traditionally, pharmacies contracted with PBMs to accept discount cards based on the assumptions that: (i) the cards could serve as a marketing tool to attract new customers, and (ii) their use would be limited primarily to instances where the patient's prescription was not covered by an insurance plan, Medicare, or Medicaid.

62.    Following the market consolidation and concomitant power therein of the major PBMs, and their recognition of discount card transactions as a lucrative revenue stream, PBMs began requiring pharmacies to accept all their discount cards as a condition of participating in their networks. To remain in-network, pharmacies are generally obligated to accept the full range of a PBM's discount cards, even when such transactions result in financial losses for a considerable number of prescriptions.

**E.    How GoodRx Works**

63.    GoodRx was launched in 2011 as a platform for aggregating prescription discount cards. The company analyzes the various discount card prices offered by major PBMs to identify the lowest price available to the patient. If this price is lower than the

CLASS ACTION COMPLAINT
CASE NO.

patient's out-of-pocket cost under the patient's insurance plan, the patient has the option to use the discount card instead.

64.     In such cases, the patient's insurance is not billed, and the cost is not applied toward any deductible or out-of-pocket maximum. Although GoodRx promotes its offerings as "prescription drug coupons," the service it actually provides is access to PBM-administered discount card programs rather than manufacturer-provided drug coupons.

65.     GoodRx's primary business model involves collecting and analyzing PBM pricing data on prescription medications, with a proprietary "pricing engine." GoodRx's "price ingestion technology enables [GoodRx] to link with multiple sources spanning the healthcare industry."[5]

66.     Consumers can use GoodRx as a tool to pay less for their prescriptions, but until recently, they needed to check GoodRx prices before filling their prescription and present the GoodRx card at the pharmacy. If a consumer chose to use his or her GoodRx card, the pharmacy would submit the claim to the PBM offering the lowest out-of-pocket cost to the patient (and lowest reimbursement rate to the pharmacy), rather than the patient's primary PBM, which may or may not be affiliated with the patient's health insurance provider.

67.     For each discount card transaction, the PBM collected a fee from the pharmacy. When a patient used GoodRx to identify a discount card, the PBM shared a portion of that fee with GoodRx. According to company reports, GoodRx earns approximately 15 percent of the total retail cost of a prescription on each transaction.

68.     Figure 4, below, illustrates GoodRx's business model as presented in a May 2021 investor presentation.

---

[5] GoodRx Holdings, Inc. 2022 Annual Report, at 12, available at https://investors.goodrx.com/static-files/1ebae550-3e31-465c-8e6a-f5c943f4e7bd (last visited Jan. 13, 2025).

CLASS ACTION COMPLAINT
CASE NO.

**Figure 4: GoodRx Business Model**



69.    In this type of transaction, there is no health plan or third-party payer reimbursing the pharmacy, as occurs in a typical insurance transaction. Instead, the patient directly pays the retail price, which serves as the revenue source for the pharmacy, GoodRx, and the PBM.

70.    GoodRx, which went public in 2020, has experienced and continues to experience rapid growth as more consumers discover that discount card prices can often be lower than their insurance co-pays.

## V.    ANTICOMPETITIVE CONDUCT

71.    As GoodRx's revenue and presence in the prescription market have grown, the company has sought to expand beyond its basic business model. GoodRx's 2023 Annual Report outlines its ongoing growth strategy of "pursu[ing] strategic partnerships and acquisitions," including agreements with PBMs and pharmacies to coordinate prices.

> We are a valuable partner to a variety of healthcare constituents. We have entered into a number of strategic agreements in recent years. For example, in 2022, we began to enter into direct contractual agreements

15

CLASS ACTION COMPLAINT
CASE NO.

with select pharmacies to complement the existing contractual agreements with our PBM partners. In addition, starting in 2023, through our partnerships with Express Scripts and CVS Caremark, we commenced operation of our integrated savings programs, which integrates our competitive discounts and pricing in a seamless experience at the pharmacy counter for eligible plan members they serve. Eligible plan members only need to utilize their existing benefit card at their preferred in-network pharmacy to benefit from our discounts and pricing, with no further action required. As part of our business strategy, we will continue to pursue strategic opportunities, including commercial relationships and acquisitions, to strengthen our market position and enhance our capabilities.[6]

72.     The "integrated savings programs" outlined in GoodRx's Annual Report represent a significant shift in the use of discount cards and their role in the prescription drug market. As detailed further below, these partnerships between GoodRx and PBMs constitute an overarching price-fixing conspiracy that is intended to and does (a) reduce competition among pharmacies, and (b) lower reimbursements and increased fees to the Independent Pharmacies that comprise the Class.

73.     If permitted to continue, these partnerships will accelerate the closure of Independent Pharmacies, which serve as a crucial check on the market power of large PBM-affiliated pharmacy chains.[7] In short, Defendants' partnerships will further erode competition in the U.S. pharmacy market, as it was designed to do.

---

[6] GoodRx Holdings, Inc. 2023 Annual Report at 12, available at https://investors.goodrx.com/static-files/108587f6-12e7-4b9c-98dd-77b57f023b38#:~:text=Over%20the%20history%20of%20the,GoodRx%20plays%20is%20pretty%20simple (last visited Jan. 13, 2025).

[7] Independent Pharmacies also provide highly-valued services the chain pharmacies do not provide, such as detailed medication counseling, comprehensive medication reviews, custom compounding of medications, specialized delivery options, and a deeper focus on community health needs.

CLASS ACTION COMPLAINT
CASE NO.

## A.    Defendants' Price-Fixing Conspiracy

74.    Beginning in 2022, GoodRx began implementing the ISP Scheme, announcing new partnerships with each of the four PBM Defendants, collectively covering over 60% of eligible U.S. patients. These partnerships provide "automatic access" to "GoodRx's pricing" for generic medications, which reflects the prices offered by PBMs under their discount card programs. According to the announcements, the price paid by the patient is applied to the patient's deductible or out-of-pocket maximum.

75.    The first such "partnership" was between GoodRx and Express Scripts and announced during GoodRx's Q3 2022 earnings call on November 8, 2022. During the call, GoodRx co-founder Trevor Bezdek announced that starting in early 2023, Express Scripts members would have seamless access to GoodRx prices for eligible generic medications.

76.    In 2023, GoodRx announced three additional "partnerships."

77.    On July 12, 2023, GoodRx and Caremark introduced a program called "Caremark Cost Saver." Under the program, Caremark members "have automatic access to GoodRx's prescription pricing . . . on generic medications." Caremark "members only need to utilize their existing benefit card at their preferred in-network pharmacy. No action is required by the plan member." The program was launched on January 1, 2024.

78.    On September 13, 2023, GoodRx and MedImpact launched a program where, "when an eligible MedImpact member fills a prescription for a generic medication, [GoodRx] will automatically compare their benefit and the GoodRx price." The program began on January 1, 2024.

79.    On October 12, 2023, GoodRx and Navitus announced a similar program where GoodRx "provides members with automatic access to GoodRx prices . . . at the pharmacy counter." The program became immediately available to some members, with broader access provided in January 2024.

80.    While these so-called "partnerships" were announced separately, they were in fact entered into by each PBM Defendant with the knowledge that the other competing

CLASS ACTION COMPLAINT
CASE NO.

PBM Defendants were entering into the same partnerships and that all such partnerships would function identically.

81.     These partnerships introduced a new process for reimbursing pharmacies for filling prescriptions. When a prescription claim is received, rather than reimbursing the pharmacy and forwarding the claim to the patient's insurance provider, the insurer's PBM uses GoodRx's software to analyze other PBMs' discount programs and determine if any offer a price lower than the patient's insurance out-of-pocket cost.

82.     If GoodRx identifies a PBM with a lower patient cost (and reimbursement to the pharmacy), the patient's PBM redirects the transaction to the PBM offering the lower price, applies the discounted price to the transaction and the patient's deductible, and charges the pharmacy a fee. That fee is divided among the patient's PBM, the PBM processing the transaction, and GoodRx.

83.     By systematically reducing the reimbursement to Independent Pharmacies, the ISP scheme ultimately hurts consumers in the long-run by reducing competition in the Relevant Market.

**Figure 5: GoodRx-PBM Partnerships**

CLASS ACTION COMPLAINT
CASE NO.

84.     This scheme, conducted entirely without the patient's knowledge, operates as follows: (i) a pharmacy fills a generic prescription and submits a claim to one of the PBM Defendants; (ii) the PBM analyzes GoodRx's data to identify whether any other PBM offers a discount card price lower than the patient's insurance out-of-pocket cost; (iii) if such a lower discount card price is found, the patient's insurer's PBM redirects the claim through GoodRx to the PBM offering the lower price; (iv) the patient's insurer's PBM applies the discount card price to the patient's insurance deductible; (v) the patient pays the discounted price at the pharmacy counter; (vi) the pharmacy pays a fee to the discount card PBM; (vii) the discount card PBM shares part of this fee with GoodRx; and (viii) GoodRx remits a portion of the fee to the patient's insurer's PBM.

85.     These partnerships were intended to, and do, operate as a price-fixing arrangement, by providing the PBM Defendants access to competitive pricing from other PBMs, and harming Independent Pharmacies like Plaintiff and the members of the Class with the lowest possible reimbursement rate for each transaction.

86.     The partnerships significantly increase the percentage of prescriptions processed through discount cards rather than traditional insurance transactions. By focusing on generic drugs, Defendants are undermining a critical revenue stream that Independent Pharmacies rely on for their survival.

87.     As explained above (*see* Section IV.C., *supra*), in discount card transactions, the PBMs claim a portion of the patient's payment at the point of sale through fees collected from the pharmacies, making these transactions more profitable for PBMs than regular insurance claims.

88.     By sharing discount card pricing data and automatically directing prescriptions to the PBM offering the lowest reimbursement rate for pharmacies, PBMs maximize the number of prescription drug transactions routed through discount cards, which generate higher profits for them. This strategy comes at the expense of regular insurance transactions, which are essential to the financial health of Independent Pharmacies.

CLASS ACTION COMPLAINT
CASE NO.

## B.    Harm to Competition

89.    Independent Pharmacies not affiliated with the major PBMs have suffered harm as a result of Defendants' price-fixing arrangement.

90.    As noted in the FTC's July 2024 report, PBMs—including those without affiliated retail pharmacies—perceive independent retail pharmacies not as clients for their services but as competitors and a threat to their market dominance:

> In addition to increasing their market power from consolidation, leading PBMs have vertically integrated not only with their own retail pharmacies, but also with specialty and mail order pharmacies. This vertical integration may be increasing PBMs' ability and incentive to disadvantage rival, independent pharmacies that directly compete with the PBMs' affiliated pharmacies. One internal PBM document—from a PBM that does not operate a retail pharmacy—makes clear that smaller, unaffiliated pharmacies are viewed as competitors with even the PBMs' non-retail affiliated pharmacies: "Retailers are our competitors. There is no win-win solution. We are seeking the same Rx. We need the best rates.[8]

91.    PBM Defendants have the incentive to disadvantage Independent Pharmacies within their networks since Independent Pharmacies compete with PBM Defendants' retail and mail order pharmacies.

92.    Independent Pharmacies generally lack the resources to monitor the intricate financial arrangements that determine their reimbursement rates from PBMs for all prescription transactions.

93.    Independent Pharmacies are harmed by the diverse revenue streams (e.g., income from specialty drugs and fees associated with discount card transactions) generated through the vertical integration and market dominance of PBMs and their affiliated pharmacies.

94.    This creates an uneven playing field, enabling PBM-affiliated pharmacies to offset losses on traditional prescription services with monopoly-driven profits.

---

[8] Fed. Trade Comm'n, *supra* note 1, at 54.

CLASS ACTION COMPLAINT
CASE NO.

Independent Pharmacies, lacking such advantages, are unlawfully disadvantaged. A growing number of Independent Pharmacies have been forced to close their doors as a direct result of PBMs' anticompetitive practices, further consolidating PBMs' market power.

95.    The ISP Scheme has exacerbated the financial challenges faced by Independent Pharmacies. Decreased reimbursement rates and increased fees imposed by PBMs have effectively diverted prescription drug dispensing revenue away from Independent Pharmacies to the Defendants and non-Defendant PBMs.

96.    This decline in revenue has contributed—and will continue to contribute—to the financial collapse of Independent Pharmacies, forcing closures and reducing competition.

97.    In 2023, Independent Pharmacies closed at an alarming rate of approximately one per day. A March 2024 survey conducted by the National Community Pharmacists Association among 10,000 Independent Pharmacy owners and managers revealed that one-third were considering shutting down in 2024 due to financial pressures.[9] This trend is expected to accelerate as discount card transactions further erode profitability.

98.    The closure of Independent Pharmacies negatively impacts the quality of care that patients receive. Independent Pharmacies have historically been a source of innovation, often adopting new technologies and services to enhance patient care.

99.    In contrast, large chain pharmacies, due to their size and bureaucratic complexity, face significant obstacles in implementing such innovations across their

---

[9] *See* Maia Anderson, *Nearly a third of independent pharmacies at risk of closure in 2024*, Healthcare Brew (March 25, 2024), https://www.healthcare-brew.com/stories/2024/03/25/nearly-a-third-of-independent-pharmacies-at-risk-of-closure-in-2024 (last visited Jan. 13, 2025).

CLASS ACTION COMPLAINT
CASE NO.

extensive networks. Independent Pharmacies, with fewer locations, can more quickly and efficiently integrate new technologies and practices.

100.   Independent Pharmacies are often deeply embedded in their communities, providing personalized care and support tailored to patients with specialized needs, chronic conditions, or complex medication regimens.

101.   In rural and underserved areas—markets that large chains often avoid due to lower profitability—independent community pharmacies frequently serve as the cornerstone of healthcare access. For many rural patients, Independent Pharmacies are the sole option for obtaining prescriptions. By offering flexible, individualized, and non-traditional care, Independent Pharmacies have historically competed effectively with larger chains. However, Defendants' anticompetitive conduct threatens to eliminate this vital avenue of competition.

## VI.   RELEVANT MARKET AND MARKET POWER

102.   The relevant market in this case is the market for pharmacy reimbursements for prescription drug dispensing services provided by network pharmacies in the U.S. (the "Relevant Market"). These services are supplied by pharmacies and purchased by PBM Defendants on behalf of third-party payers, such as health insurers.

103.   The Big 3 PBMs, two of which are PBM Defendants, process nearly 80% of prescription drug claims in the United States, an increase from 70% in 2016. When Humana, Prime Therapeutics, and Defendant MedImpact are included, the group controls more than 90% of all claims.

104.   Specifically, the PBM Defendants control reimbursement for over 60 percent of eligible U.S. lives. As a result, pharmacies have no viable option but to contract with the PBM Defendants.

105.   Each PBM Defendant operates as a wholly-owned subsidiary of a healthcare conglomerate that also owns mail-order, specialty, and retail pharmacies, as well as large health insurance companies and other entities involved in the prescription dispensing market. *See* Figure 2, *supra*.

CLASS ACTION COMPLAINT
CASE NO.

106.    The relevant geographic market in this case is the U.S. The U.S. healthcare industry, including the Relevant Market, is governed by federal and state laws and regulations that are unique to the U.S. The relevant geographic market cannot be smaller than the U.S., as pharmacy reimbursements are determined by PBMs operating nationwide.

107.    Defendants, both collectively and individually, wield sufficient market power to harm competition in the Relevant Market.

## VII.    ANTITRUST INJURY

108.    Defendants' anticompetitive conduct caused and causes Independent Pharmacies to suffer antitrust injury in the form of:

(a)    Decreased reimbursements for dispensing generic prescription drugs; and

(b)    Increased fees to Defendants resulting from discount card transactions;

109.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.    INTERSTATE COMMERCE

110.    At all relevant times, Defendants offered, adjudicated, and disbursed reimbursements for prescription drug claims in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

111.    At all relevant times, Defendants transmitted and received funds, contracts, invoices, and other forms of business communications and transactions, through the mail and over the wires in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States in connection with the adjudication of prescription drug reimbursements as part of GoodRx's Integrated Savings Program.

112.    In furtherance of their efforts to retrain competition, Defendants employed the U.S. mail and interstate and international telephone lines, as well as means of interstate and international travel. Defendants' activities' were within the follow of, and have substantially affected (and will continue to substantially affect), interstate commerce.

CLASS ACTION COMPLAINT
CASE NO.

## IX.    CLASS ACTION ALLEGATIONS

113.    Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as a representative of the following Class:

> All entities in the United States and its territories that have (1) dispensed a generic prescription drug to an insured patient and (2) received reimbursement from one of the PBM Defendants for that drug at a GoodRx-supplied price from January 1, 2023 (or the date on which Express Scripts launched its Price Assure program) until the anticompetitive effects of Defendants' unlawful conduct cease.

114.    The following persons and entities are excluded from Class:

(a)    All pharmacies owned by, operated by, or affiliated with the PBM Defendants;

(b)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(c)    All federal governmental entities;

(d)    All Counsel of Record; and

(e)    The Court, Court personnel, and any member of their immediate families.

115.    The Class is so numerous and geographically dispersed as to make joinder impracticable. Plaintiff does not know the exact number of Class members but can obtain it from Defendants in discovery. Plaintiff believes that there are at least thousands of Class members.

116.    Common questions of law or fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful schemes, Defendants' anticompetitive conduct impacted all or nearly all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact or law include:

(a)    Whether Defendants formed a horizontal contract, combination, or conspiracy, pursuant to which they artificially suppressed the rate paid to Independent Pharmacies for dispensing medications to individuals who prescription drug benefits were administered by the PBM Defendants;

24

(b)     Whether Defendants' alleged misconduct constitutes a violation of Section 1 of the Sherman Antitrust Act;

(c)     Whether Defendants' conduct caused members of the Class members to receive artificially-suppressed reimbursements for dispensing medications to patients whose prescription drug benefits were administered by the PBM Defendants;

(d)     Whether the anticompetitive scheme alleged herein has substantially affected interstate commerce;

(e)     Whether Defendants' anticompetitive conduct caused antitrust injury to Plaintiff and members of the Class;

(f)     Whether a monetary damages methodology exists that is capable of providing damages on a classwide basis, and the proper quantum of such damages; and

(g)     Whether injunctive relief is warranted to end Defendants' anticompetitive conduct.

117.     These common questions predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to and injuring the Class as a whole. In cases alleging a horizontal price-fixing conspiracy, the common questions regarding the conspiracy's alleged existence by itself has been held to predominate over any conceivable individualized issues, thus warranting class certification.

118.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will enable thousands of Independent Pharmacies to benefit from the prosecution of one action in a single forum efficiently and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining

CLASS ACTION COMPLAINT
CASE NO.

redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in managing this class action.

119.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## X.    CLAIMS FOR RELIEF

### COUNT I

### Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

120.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

121.    Plaintiff seeks relief on behalf of itself and all Class members under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

122.    Acting directly and through their respective divisions, subsidiaries, agents, and affiliates, Defendants participate in interstate commerce related to the reimbursement of claims for prescription drugs.

123.    The PBM Defendants are horizontal competitors in the Relevant Market. Those Defendants compete to secure contracts with health plans, which authorize them to reimburse claims for prescription drugs used by the health plans' members and to generate revenue from pharmacies as part of these reimbursements. GoodRx and the PBM Defendants also compete directly with each other for patients' claims involving prescription drug reimbursements.

124.    Starting on or around January 1, 2023, Defendants entered into and engaged in an ongoing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce. This conduct constitutes a *per se* violation of Section 1 of the Sherman Act.

125.    Specifically, Defendants conspired to artificially lower prescription drug reimbursement rates to Plaintiff and the Class.

126.    In furtherance of that conspiracy, Defendants have committed various acts, including the following:

(a)     The PBM Defendants shared confidential, proprietary, and detailed internal reimbursement data with GoodRx to compare their negotiated rates against those aggregated by GoodRx;

(b)     Integrated GoodRx's reimbursement aggregator into the PBM Defendants' claims processing systems, granting the PBM Defendants real-time access to competitors' negotiated rates and enabling them to identify competitors;

(c)     Utilized data from GoodRx's integrated aggregator to determine reimbursement rates for prescription drug claims;

(d)     Paid reimbursements for prescription drug claims based on rates provided by GoodRx's integrated aggregator;

(e)     Delegated control of reimbursement rates to GoodRx, fully aware that GoodRx would establish artificially low rates;

(f)     Exchanged sensitive, real-time, confidential, and detailed prescription drug claim reimbursement data with each other through GoodRx's integrated aggregator;

(g)     Increased fees imposed on Independent Pharmacies by allowing both GoodRx and a patient's PBM to collect fees, whereas only one party would have done so absent the ISP Scheme;

(h)     Evaded effective rate guarantee obligations to Independent Pharmacies by transferring transactions that would otherwise be covered under those guarantees to GoodRx, which is excluded from such guarantees.

127.     As a direct and proximate result of Defendants' unlawful cartel, Plaintiff and Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

128.     Plaintiff and the Class are entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief.

CLASS ACTION COMPLAINT
CASE NO.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully request that the Court:

A.     Determine that this action may be maintained as a class action, appoint Plaintiff as the class representative and its counsel as class counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.     Adjudge and decree that Defendants have entered into a contract, combination, or conspiracy to fix, raise, stabilize, or maintain reimbursements for prescription drugs at artificially low levels in violation of Section 1 of the Sherman Act1;

C.     Enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law;

D.     Enjoin Defendants from continuing to engage in anticompetitive practices alleged herein and from engaging in other practices with the same purpose and effect as the challenged practices; and

E.     Award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

CLASS ACTION COMPLAINT
CASE NO.

Dated: February 3, 2025                    Respectfully submitted,

                                           /s/ *Dena C. Sharp*

                                           Dena C. Sharp (SBN 245869)
                                           Scott Grzenczyk (SBN 279309)
                                           Sean Greene (SBN 328718)
                                           **GIRARD SHARP LLP**
                                           601 California Street, Suite 1400
                                           San Francisco, CA 94108
                                           Tel: (415) 981-4800
                                           Fax: (415) 981-4846
                                           dsharp@girardsharp.com
                                           scottg@girardsharp.com
                                           sgreene@girardsharp.com

                                           Michael J. Boni (pro hac vice to be filed)
                                           Joshua D. Snyder (pro hac vice to be filed)
                                           John E. Sindoni (pro hac vice to be filed)
                                           Benjamin J. Eichel (pro hac vice to be filed)
                                           **BONI, ZACK & SNYDER LLC**
                                           15 St. Asaphs Road
                                           Bala Cynwyd, PA  19004
                                           Tel: (610) 822-0200
                                           mboni@bonizack.com
                                           jsnyder@bonizack.com
                                           jsindoni@bonizack.com
                                           beichel@bonizack.com

                                           *Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT
CASE NO.